A. PAGE LOCKARD *v.* CITY OF SALEM, *etc.*

(No. 9602)

Submitted October 3, 1944. Decided November 21, 1944.

238

*Robinson & Stump* and *John S. Stump, Jr.,* for plaintiff
in error.

*Maxwell & Young, Haymond Maxwell, Sr.,* and *J. Paul
Bumgardner,* for defendant in error.

RILEY, JUDGE:

In this action of assumpsit instituted in the Circuit
Court of Harrison County, A. Page Lockard, plaintiff, filed
his declaration containing the common counts and a spe-
cial count alleging a breach of contract between plaintiff
and defendant, whereby defendant city undertook to lease
to plaintiff for a period of ten years its municipal water
system. This writ of error is prosecuted by defendant to
a judgment in plaintiff's favor, based upon a jury verdict
in the amount of $12,006.99.

In a bill of particulars filed with the declaration, plain-
tiff claims four aggregate sums: $2,524.39 for claimed ex-
penditures during the ten-months period in which plain-
tiff operated the water system under the lease; $255.15 for
materials which plaintiff claims he purchased but did not
install in the water system; $2,000.00 for the claimed value
of plaintiff's services in the operation of the water system
during said ten-months period; and $25,000.00 for loss of

profits which plaintiff claims he would have made if his operation of the water system had extended over the ten-year period of the lease.

Besides pleading the general issue, defendant gave plaintiff notice of an offset in the amount of $9,704.95, representing money alleged to have been collected by plaintiff from water consumers during the ten months of actual operation. Plaintiff pleaded a counter-offset in the amount of $8,705.00 as the claimed net cost of operating the water system during the ten months of plaintiff's operation.

After some negotiation defendant's council adopted an ordinance providing for the leasing of the water system to plaintiff, in which the alleged contract upon which this action is based was set out verbatim and approved, which ordinance provided for a special election to be held on February 4, 1941, for the purpose of submitting the proposed lease to the citizens of the City of Salem. At an election, held pursuant to this ordinance, the proposal to lease the water system to plaintiff was approved.

On February 6, 1941, the lease, as approved, with an interlineation making it effective April 15, 1941, was executed and on the effective date the water system was turned over to plaintiff, who began its operation.

Following the adoption of the ordinance submitting the proposed lease to a vote, Lockard wrote a letter advising the Public Service Commission of West Virginia of the proposal, and on February 12, 1941, he advised the commission by letter of the result of the election. The commission replied by letter, inclosing to plaintiff its rules and the Public Service Commission Law. After the execution of the lease, on June 2, 1941, plaintiff appeared before said council, and, according to the minutes of the council, "requested that the City ask the Public Service Commission what procedure should be taken in connection with the leasing of the water system." On July 7, 1941, plaintiff again appeared before the council and asked that the city petition the Public Service Commission for permission to operate the water system. At a meeting of the council held on July 9, 1941, council determined to send to

Charleston defendant's mayor, Oscar J. Andre, an attorney employed by the city some time after plaintiff began operation of the water system on the effective date of the lease, and one member of council, in company with plaintiff and his attorney or representative, to interview the Public Service Commission. Such interview was had with the commission and on July 18 council adopted a resolution providing that the defendant city should file a petition submitting to the commission the question whether the lease should be approved. Such petition was filed on behalf of the city, but withdrawn by its council at the commission's request. On September 10, 1941, a motion was carried at a special session of council directing the mayor and city attorney to file a petition with the commission "without giving any reasons why the lease between the City and A. Page Lockard should be approved or rejected." Thereafter James A. McBride and others filed before the Public Service Commission a petition against the defendant and plaintiff, seeking to cancel the alleged lease, and praying for the restoration of the water system to defendant. Lockard filed an answer to this complaint, in which he prayed its dismissal and the approval of the lease by the Public Service Commission. Defendant then filed an answer praying "that the Commission have a full hearing on this matter and that such orders be made and entered herein as shall be meet and proper under the circumstances of this case." At a special session held on October 1, 1941, council ordered its attorney to withdraw its petition "asking for approval or ratification of said alleged lease" and submit in lieu thereof a petition in brief form presenting the alleged lease to the Public Service Commission for its approval or disapproval, as the evidence warrants, or, if said attorney thinks proper, submit the whole question for settlement in the matter then pending before the commission.

The McBride complaint came on for hearing before the Public Service Commission on November 4, 1941, at which time the commission found that it was without jurisdiction. To this finding the complainers filed a petition for

rehearing. By order entered on January 21, 1942, the commission set aside its finding and set the proceeding for further hearing on February 23, 1942, but before the time set for such further hearing Lockard by letter dated February 3, 1942, advised defendant, its mayor and each member of its council that he would on February 14, 1942, at four P. M. "cease operating that part of the city water works which was transferred to me and will deliver the keys to all locks to all premises occupied by me to the office of the City Recorder". At the appointed time plaintiff ceased to operate the water system and operation thereof was resumed by the city. The Public Service Commission, having heard of this situation, entered an order on March 18, 1942, dismissing, without prejudice, the proceeding based upon the complaint of McBride and others. This order was modified by a later order dismissing the complaint without prejudice. Following the resumption of the operation of the water system by the city, Lockard served upon defendant a notice of the claims upon which this action is based, which claims were rejected by the City Council. This action followed.

It is unnecessary to state all of the terms and provisions of the contract. It provided for the lease of defendant's entire water system to the plaintiff for a period of ten years at a monthly rental of $200.00 a month; that lessee was to supply all labor and was to have full and complete control of the water system; that he was to have one year from the date of consummation of the agreement to obtain an adequate supply of water; that he was to spend a sum not exceeding $10,000.00 for equipment or pay to defendant the difference between $10,000.00 and the amount of such expenditure; that lessee was to keep the water system in ordinary repair and give bond in the amount of $2,000.00 for the faithful performance of the contract.

At the trial plaintiff testified concerning the expenditure made by him during the ten months of operation of the water system. In support of his claim for the loss of future profits, he testified to an estimated revenue of $12,000.00 annually and to an estimated expense of $8,855.00 an-

nually, his testimony being based upon his ten months' experience in operating the water system under the lease. Plaintiff also introduced witnesses who testified that the supply of water was better during the period of his operation of the system than before, and that the contract conferred no undue advantage on plaintiff and did not adversely affect the interests of the public. Defendant introduced witnesses who testified that the alleged contract adversely affected the interests of the public.

In the trial court, as here, defendant denies that plaintiff was entitled to have submitted to the jury the question of damages to the plaintiff by reason of estimated profits under the contract after expiration of the ten months period of operation; but asserts in its brief and argument that it did not resist at the trial, nor does it resist here, plaintiff's claim to have submitted to the jury the question of damages, if any, which plaintiff may be entitled to recover because of expenditures made by him in good faith in an effort to improve the city's water system. So the basic issue in this case is whether the court properly submitted to the jury the question of plaintiff's right to future profits under the contract.

Because the right to such future profits can be asserted successfully only if the alleged contract created a valid and subsisting lease of the water system during the ten-year period purported to be covered thereby, the controlling question in this case is whether the contract was legal and enforceable, or whether it was void because it was not initially submitted to the Public Service Commission of West Virginia for approval, or, to state it another way, the proposed lease not having received the consent and approval of the Public Service Commission, was there at any time a legal and valid contract of lease? In this regard defendant asserts that under Chapter 115, Acts West Virginia Legislature, 1935, amending Code, 24-2, by adding thereto Section 12, the alleged contract was illegal and unenforceable because the Public Service Commission did not in the first instance give its approval to it. It is asserted that the court improperly submitted to the jury

the questions whether the terms and conditions of the contract are reasonable, whether either party thereto was given an undue advantage over the other, and whether the contract adversely affected the interests of the public. The pertinent provisions of Section 12 read:

> "*Unless the consent and approval of the Public Service Commission of West Virginia is first obtained*: * * * **(b)** no public utility subject to the provisions of this chapter, except railroads other than street railroads, may purchase, lease, or in any other manner acquire control, direct or indirect, over the franchises, licenses, permits, plants, equipment, business or other property of any other utility; **(c)** *no public utility subject to the provisions of this chapter*, except railroads other than street railroads, *may* assign, transfer, *lease*, sell, or otherwise dispose of *its franchises, licenses, permits, plants, equipment, business or other property or any part thereof.* * * *

> "*The Commission may grant its consent in advance or exempt from the requirements of this section all* assignments, transfers, *leases*, sales or other disposition of the whole or any part *of the franchises, licenses, permits, plants, equipment, business or other property of any public utility*, or any merger or consolidation thereof and every contract, purchase of stocks, arrangement or other transaction referred to in this section, upon proper showing that the terms and conditions thereof are reasonable and that neither party thereto is given an undue advantage over the other, and do not adversely affect the public in this state. * * *

> "*Every* assignment, transfer, *lease*, sale or other disposition of the whole or any part *of the franchises, licenses, permits, plant, equipment, business or other property of any public utility*, or any merger or consolidation thereof and every contract, purchase of stock, arrangement or other transaction referred to in this section made otherwise than as hereinbefore provided *shall be void to the extent that the interests of the public in this state are adversely affected, but this shall not be construed to relieve any utility from any duty required by this section.*"   (Italics supplied.)

From the foregoing it may be readily seen that the parties executed the purported lease on February 6, 1941, without having first obtained the consent and approval of the Public Service Commission, or the waiver thereof, and that such consent and approval, or waiver, were not thereafter obtained. What then is the effect of said Section 12? Under Code, 24-2-1, defendant's water system is a public utility and subject to the jurisdiction of the Public Service Commission. This section provides in part, "The jurisdiction of the commission shall extend to all public utilities in this State, except vehicles operated upon streets and roads, and shall include any utility engaged in any of the following public services: * * * supplying water, gas or electricity, by municipalities or others; * * *". It should be noted that said Section 12 of Article 2 at its very beginning provides: "Unless the consent and approval of the public service commission of West Virginia is *first* obtained: * * * (c) no public utility subject to the provisions of this chapter * * * may * * * lease * * * its franchises, licenses, permits, plants, equipment, business or other property or any part thereof. * * *" (Emphasis supplied.)

In *City of Mullens* v. *Power Co.*, 122 W. Va. 179, 7 S. E. 2d 870, this Court, applied Code, 8-12-9, as amended by Chapter 26, Acts West Virginia Legislature, First Extraordinary Session, 1933, and Chapter 52, Acts West Virginia Legislature, 1937, which provides that for the purpose of acquiring any water works system a municipality shall have the right of eminent domain; but that "such right of eminent domain for the acquisition of a complete privately owned water works system shall not be exercised * * * without prior approval of the public service commission of West Virginia * * *." In that case this Court held that Code, 8A-4-26 (the Home Rule statute) does not authorize the use of the power of eminent domain by a municipality for the acquisition of a privately owned public utility. We see no substantial difference in the wording of Code, 8-12-9, as amended, "without prior approval of the public service commission" and that of Section 12 of Code, 24-2, as amended by Chapter 115, Acts, 1935, "Unless

the consent and approval of the public service commission of West Virginia is first obtained". But our attention is invited to the wording contained in the last paragraph of said Section 12, which provides that "Every * * * lease * * * of the franchises, licenses, permits, plant, equipment, business or other property of any public utility * * * shall be void *to the extent that the interests of the public in this state are adversely affected,* but this shall not be construed to relieve any utility from any duty required by this section". Under this wording it may be suggested that as Section 12 of the statute under consideration, unlike Code, 8-12-9, states a measure or degree to which a lease may be void where the consent and approval of the commission, or the waiver thereof, are not first obtained, a question is presented for court determination. But Section 12 specifically provides that the provision thereof that a contract shall be void to the extent that the interests of the public are adversely affected "shall not be construed to relieve any utility *from any duty required by this section."* The only duty required of any public utility by Section 12 is that application be made to the Public Service Commission for its consent and approval of the undertakings embraced in the statute. In order to give any meaning to the last-mentioned provision of the statute, we think the Legislature meant to make mandatory the duty of a public utility, before proceeding to acquire the rights or perform the undertakings permitted by the statute, to obtain from the Public Service Commission its consent and approval, or the waiver thereof. In the *Mullens Gas Company* case, this Court declared that "It is the policy of the law of this state that all public utilities, whether publicly or privately owned, shall be subject to the supervision of the Public Service Commission. Code, Chapter 24, Articles 2 and 3." This policy considered in the light of the provisions of Section 12 of the instant statute prompts this Court to hold that the alleged contract of lease never became effective, and in that sense is void, and therefore plaintiff cannot maintain an action upon it. In so saying, we nevertheless give meaning to the words "shall be void to the extent that

the interests of the public in this state are adversely affected * * *". If, in the first instance, application is made to the Public Service Commission, and the commission finds that a contract, the approval of which is sought, does not adversely affect the interests of the public, in whole or in part, whereas, in fact, it does, its finding is simply erroneous. The error may be corrected on application to this Court. It follows that plaintiff is not entitled to any recovery for future profits from the time he surrendered the plant until the expiration of the ten-year period provided for in the lease.

It would be decidedly inequitable for the defendant to accept the benefit of plaintiff's expenditures of money and services without any compensation therefor in view of the fact, as this record discloses, defendant itself, through its own inaction and lack of diligence, was partly responsible for plaintiff's failure to obtain the consent and approval of the Public Service Commission to the lease in question. Evidently prompted by a commendable desire that plaintiff suffer no injustice, defendant, both in the trial court and on this writ of error, admitted liability for the expenditures made by plaintiff in improving the water system. In view of the fact that plaintiff during the ten months period made substantial expenditures of money and rendered services in the improvement and operation of the system, and defendant made no denial of the existence of a valid lease, we think defendant should be allowed to recover, under the common counts, the money actually expended by him in improving and operating prudently the water system, together with the reasonable value of any services which he may have rendered in such improvement and operation, less any net profits which the plaintiff might have derived from the operation of said water system. The nature of quasi assumpsit historically is of equitable origin. It lies on an implied promise to pay what *ex aequo et bono* is due. *Garber's Admr.* v. *Armentrout,* 32 Gratt. (73 Va.) 235; *Abell* v. *Penn Mutual Life Insurance Co., Inc.,* 18 W. Va. 400; *Lynch* v. *Merchants National Bank of West Virginia,* 22 W. Va. 554; *Keener* v.

*Bank of Gassaway,* 114 W. Va. 780, 173 S. E. 884. And the equities here are with the plaintiff. In view of defendant's position during the ten months of the operation of the water system, it cannot be heard to say now, nor has it attempted to do so, that the plaintiff cannot be made whole under the common counts because he is in the inconsistent positions of asserting what he contends to be a valid contract under the special count and no contract, except such as the law implies, under the common counts.

The judgment of the trial court, therefore, is reversed, the verdict set aside and a new trial awarded.

*Judgment reversed; verdict set aside;
new trial awarded.*

LOVINS, JUDGE, dissenting:

I am not in agreement with the conclusion expressed in the majority opinion which is premised on the theory that the contract between the plaintiff and defendant is wholly void. The opinion relies on the provisions of Section 12, Article II, Chapter 115, Acts of the Legislature, 1935, as forbidding contracts of the kind here considered, the same being contrary to the public policy of this State. I think the majority opinion extends the statute beyond its letter, as well as its spirit. In my view the limit to which the statute should be applied is plainly set forth by the provisions thereof following: "* * * and every contract, * * * made otherwise than as hereinbefore *provided shall be void to the extent that the interests of the public in this state are adversely affected, * * *".* (Italics supplied.)

It is a cardinal principle of statutory construction that where there is no ambiguity in a statute, it should be applied in accordance with its provisions, without extension or limitation by construction. The majority opinion attributes to the statute an effect far beyond that indicated by its plain terms and provisions.

Under the holding of the majority opinion, regardless of whether a contract of the kind here considered has any effect on the public interest, adverse or otherwise, it is wholly void in the absence of approval by the Public

Service Commission. I do not think the Legislature intended any such result. It is reasonable to say that the converse of the rule laid down in the statute would be true: that if the contract does not affect the public interest, or if the public interest is favorably affected, that the ban of the statute has no application and that such contract is valid and enforceable.

There is no inherent illegality in the contract leasing defendant's water system to the plaintiff, and unless the contract is made illegal by the statute it should be held valid. The majority opinion holds the contract void without any showing of its effect on the public interest. So far as shown herein, the contract may have had no effect on the public interest, adverse or favorable, or may have had a favorable effect on the public interest, in either of which events I believe the statute here relied on would have no application. The applicability of the statute to the class of contracts described therein depends entirely on whether the contract affected the public interest adversely. If there was no adverse effect, a contract such as the one here considered is valid. If adverse to the public interest, a contract of the kind described in the statute should be held void *only* to the extent that the public interest is adversely affected.

Without doubt the Legislature has the power to enact a statute providing that a contract for the sale or lease of the property of a public utility, or any part thereof, should be wholly void for all purposes. But no such statute has been enacted, and such provision should not be supplied by judicial construction and application.

It has been contended in this case that a circuit court has no power to determine the effect of such contracts on the interests of the public. I know of no inhibition which prevents a circuit court from ascertaining a state of facts to which the terms of the statute here under consideration could be properly and effectively applied. The fundamental right of persons to contract with reference to their properties should not be set aside upon a supposed legislative intent expressed in a statute which is clearly in-

applicable except in certain special circumstances set forth in the legislative enactment.

For the foregoing reasons, I would affirm the judgment of the trial court.